**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**UNITED STATES OF AMERICA,**
**ETHYLENE CRENSHAW, ex rel.,**

**Plaintiffs,**

**-vs-** **Case No. 6:06-cv-1462-Orl-19KRS**

**NANCY DEGAYNER, DEGAYNER ASSOCIATION MANAGEMENT, INC., ELDIST MARIE LEWIS, CAROL BLACKMAN, KASS GENNEKEN, ROYAL PALM COURT HOMEOWNERS ASSOCIATION,**

**Defendants.**

---

# ORDER

This case comes before the Court on the following:

1. Motion for Final Summary Judgment and Memorandum of Law by Defendants (Doc. No. 67, filed Mar. 13, 2008);

2. Motion for Summary Judgment by Plaintiffs (Doc. No. 69, filed Mar. 13, 2008)[1];

3. Memorandum of Law of Defendants in Opposition to Plaintiffs' Motion for Summary Judgment (Doc. No. 81, filed Mar. 27, 2008);

4. Response of Plaintiffs in Opposition to Defendants' Motion for Summary Judgment and Memorandum of Law in Support Thereof (Doc. No. 82, filed Apr. 11, 2008); and

---

[1] The actual title of the Motion is "Plaintiffs' United States of America, Ethylene Crenshaw, ex rel., Motion for Summary Judgment Nancy Degayner, Degayner Association Management, Inc., Lewis, Blackman, and Royal Palm Court Homeowner's Association." (Doc. No. 69 (punctuation as in original).) This title appears to indicate that Plaintiffs are moving for summary judgment against only those Defendants specifically listed in the title. However, because Plaintiffs do not specify the scope of their request for summary judgment elsewhere, the Court will assume that Plaintiffs are moving for summary judgment against all Defendants named in the action.

5. Notice of Plaintiffs of Filing Affidavits and Exhibits in Support of Response in Opposition to Defendants' Motion for Summary Judgment (Doc. No. 83, filed Apr. 14, 2008).

**Background**

Plaintiff Ethylene Crenshaw filed this action against her homeowners association, Royal Palm Court Homeowners Association ("the Board"); members of the Board, Eldist Marie Lewis, Carol Blackman, and Kass Genneken; a management company hired by the Board, Degayner Association Management, Inc. ("the management company"); and the management company's apparent operator,[2] Nancy Degayner. (Doc. No. 41, filed Sept. 21, 2007.) Crenshaw alleges violations of the False Claims Act, 31 U.S.C. §§ 3729-33 (2006), as well as several Florida common-law torts: conversion, civil conspiracy, and intentional infliction of emotional distress. (*Id.*) The United States declined to intervene in the action. (Doc. No. 9, filed Apr. 6, 2007.)

The dispute began when Crenshaw objected to the Board's handling of property damage caused by several hurricanes in 2004. (Doc. No. 69 at 2-3.) It has since escalated into a lawsuit, with allegations of a fraudulently-procured government loan, conversion, racial harassment, and property destruction. (*Id.* at 4-13.) Crenshaw has filed a Motion for Summary Judgment on her False Claims Act and civil conspiracy claims, while the Board has filed a Motion for Summary Judgment on all claims. (Doc. Nos. 67, 69.)

---

[2] There is no evidence in the record explaining exactly what position Degayner holds in the management company.

**A. Parties to the Action**

Ethylene Crenshaw owns a condominium in the Royal Palms Court community, located in Daytona Beach, Florida. (Doc. No. 58 at 5.) Crenshaw originally lived in the condominium, but she has since moved to Orlando and now uses the condominium as a rental property. (*Id.*)

The Royal Palm Courts community is governed in large part by a Board of Directors. According to the community's bylaws, the Board is comprised of between three and seven members. (Doc. No. 67-5 at 6.) At times relevant to this case, Defendants Lewis, Blackman, and Genneken served on the Board. (Doc. No. 41, ¶¶ 7-9.) As a general matter, the bylaws entrust the Board with power to "do all such acts and things as are not by law or by the Declaration of Condominium, this Association's Articles of Incorporation, or these Bylaws, directed to be exercised and done by the Unit Owners." (Doc. No. 67-5 at 9.) The bylaws also list several specific examples of the Board's powers such as the "power to make assessments, collect said assessments, and use and expend assessments to carry out the purposes and powers of the Association" and to "further the improvement of the Condominium property, both real and personal . . . ." (*Id.* at 10.)

In January of 2005, the Board hired Degayner Association Management, Inc., operated by Defendant Nancy Degayner, to manage the condominium community. (Doc. 69 at 3.)

**B. Loan Application and the Special Assessment**

It is undisputed that the Board obtained a loan from the Small Business Administration ("SBA") in 2006. The exact terms of the Loan Agreement are similarly undisputed. On page one, the agreement states that the borrower will provide as a collateral a "Security Interest in all rights of Debtor to receive and collect proceeds arising pursuant to any and all special assessment and any other assessments, levied by Debtor to amortize and repay Debtor's loan from Secured Party and

all accounts and/or general intangibles arising from such assessment(s)." (Doc. No. 67-2 at 1.) The agreement next requires that the "[t]he association's general membership will pass a special assessment, according to its governing documents." (*Id.*) According to the agreement:

> The association will pass a resolution which specifically refers in the provisions for the special assessment as stated . . . above. The resolution will further provide that the special assessment was approved by a sufficient majority of the association's general members at a meeting held for that purpose. A copy of this resolution, certified by the association's Secretary, must be submitted to the SBA prior to any disbursement of this Loan.

(*Id.*) The agreement also requires the borrower to "submit an opinion from an attorney who carries professional liability insurance . . . stating that the general membership of the association has approved a special assessment as required . . . ." (*Id.* at 2.) The final relevant portion of the agreement requires the "Borrower to use the proceeds of this Loan solely to rehabilitate or replace property of Borrower . . . damaged or destroyed by disaster occurring in the month of September, 2004." (*Id.* at 2.)

Despite the undisputed terms of this agreement, however, the parties dispute what happened before, during, and after the loan application process, as well as the actual amount of money that the Board borrowed. According to Crenshaw, in 2004 about four of the six condominium buildings in the community needed roof repair.[3] (Doc. No. 69 at 2 (citing Composite, Ex. 10, 11, 12).)[4] During

---

[3] Crenshaw fails to adequately explain her citation method, giving the following description: "EX, denotes the Exhibits Attached to Crenshaw's Material Disclosures which are attached to her deposition as Plaintiff's Exhibit Composite 1, Attachments 1-68 and which were previously filed (C @ 93-94)." (Doc. No. 69 at 1 n.1.) Crenshaw does not explain what "C" represents or whether the numbers following "C" refer to page numbers or exhibit numbers. However, the Court assumes that "C" stands for "composite" because "C" is not an accepted Bluebook abbreviation for court documents and Crenshaw refers to the composite earlier in the sentence. The Court also assumes that the numbering system refers to exhibit numbers, rather than page numbers, because the composite is not consecutively paginated. Nevertheless, under these (continued...)

September of 2004, before the repairs could occur, the community was damaged by several hurricanes. (*Id.*) Later that month, members of the Board passed and signed a resolution that the Board would seek financial assistance from the federal government to pay for hurricane damage not covered by the community's insurance provider. (*Id.*) Afterwards, the Board obtained an application for a disaster business loan from the Small Business Administration. (*Id.* at 3.) The Board indicated on the application that it would use the money from the loan to repair hurricane damage. (*Id.*)

In January of 2005, the Board hired Degayner and her management company to take over management of the association. (*Id.*) Crenshaw next states:

> On February 10, 2005 Marie Lewis signed an affidavit, prepared by DeGayner which On [sic] February 10, 2005 Eldist Marie Lewis, President of the Association signed an Affidavit prepared by Nancy DeGayner to AAA Title Insurance Corporation which stated, "1. That there are sufficient [sic] in the Royal

---

[3](...continued)
assumptions, a number of Crenshaw's citations do not correspond to any filed materials. For instance, the last exhibit in the composite submitted to the Court was numbered 68. However, several of Crenshaw's citations refer to exhibits with a higher numerical label, such as 109. For the sake of accuracy, the Court has checked both the exhibit number and attempted to locate a coordinating page number (despite the fact that the pages are not numbered) for all citations to "C." The Court has also reviewed every document in the record in an attempt to locate miscited documents.

In any event, much of Crenshaw's account of the Board's actions lacks evidentiary support. For example, despite a citation to "C @ 10-12," Crenshaw's claim that four of six roofs needed repairs in 2004 does not find any support in exhibits 10, 11, or 12 of her composite of exhibits, or on pages 10 through 12 of the composite. Other factual assertions simply contain no citations to the record. (*E.g.*, Doc. No. 69 at 2-3, ¶¶ 5-11.)

Accordingly, the Court's recitation of Crenshaw's claims should not be construed as findings of fact.

[4] Citations to the hard copy materials submitted by Crenshaw will take two forms. Citations to exhibits in the composite of exhibits will appear as "Composite, Ex. __." Citations to the exhibits that are attached to Crenshaw's deposition, but not as part of the composite, will be denoted as "Ex. __." All other citations will refer to the CM/ECF Document Number which appears on the heading of all electronically filed documents.

> Palm Court Condominium HOA, Inc. account to pay Wayne's Roofing and Sheet metal in full." The affidavit further stated, "2. That this will not cause a special assessment to be placed on any of the Condominium Units."

(Doc. No. 69 at 3.)[5] Next, "[o]n April 15, 2005, Eldist Marie Lewis and Miriam Coates signed [a] Loan Authorization and Agreement (Control # 3620-21124) without the knowledge of the full Board or the owners at Royal Palm Court Condominiums HOA, Inc." (*Id.* at 4 (citing Ex. 1).)

According to Crenshaw, on April 15, 2005, Lewis and Coates, another Board member, signed the Loan Authorization and Agreement. (*Id.* at 4.) Then, apparently referring to a letter drafted by a Board member during the following year, Crenshaw explains that:

> [O]n January 24, 2006, Carol Blackman, Secretary/Treasurer, sent a letter to Jason Brandolini, Investigator for the State of Florida, Department of Business and Professional Regulations in which she denied the existence of the Agreement signed on April 15, 2005. In Item #2, Ms. Blackman stated, "…The Loan Authorization and Agreement is enclosed, however, it does not have the date stated in your letter. The date on their letter to us is April 13, 2005. No way could we have received that document from California to sign and give it an April 15 date." A copy of the letter

---

[5] Crenshaw's Motion for Summary Judgment and her Response to Defendants' Motion for Summary Judgment contain enough grammatical errors, typographical errors, and incomplete sentences that it becomes difficult at points to decipher her factual and legal arguments. As such, portions of her submissions are quoted verbatim to ensure that this Order accurately represents her arguments. Briefs filed in a federal court are not expected to be flawless, but they should be sufficiently error-free and coherent to allow opposing counsel and the Court to understand the party's arguments. *See, e.g.*, *In re Roete*, 936 F.2d 963, 967 (7th Cir. 1991) (upholding the district court's imposition of sanctions where numerous unsupported arguments and grammatical errors in a party's pleading "required the court to spend additional time to insure that a proper decision is reached"); *Pigg v. United States*, No. Civ. 2:05-cv-00895, 2006 WL 470608, at *1 n.1 (S.D. W.Va. Feb. 27, 2006) ("When submitting briefs to the court, attorneys should strive to set forth thoughtful, well-crafted arguments through established principles for writing and citation. Although the court does not demand perfection, it does expect attorneys to reach a minimum threshold of proficiency . . . . In addition to innumerable spelling and grammatical errors, the document demonstrates counsel's considerable misunderstanding of the proper rules of citation as set forth by the Bluebook.").

> is attached here as Ex. "2". In Item # 10, Ms. Blackman claimed to have a majority vote by the members. She also admits that the Association has collected a large portion of the proceeds, however, to my [sic] knowledge,[6] those proceeds have not been turned over to the SBA as required in Section 2(B)(2) of the Loan Authorization and Agreement.

(Doc. No. 69 at 4 (punctuation as in original).) Next, on April 30, 2005, the Board held a meeting during which Lewis failed to notify other Board members and owners that a loan authorization and agreement had been signed on April 15, 2005. (Doc. No. 69 at 4.)

Three months later, the Board held another meeting. Crenshaw gives the following account:

> On July 30, 2005, the Board held a meeting in which DeGayner, for the first time revealed the fact that they had been seeking approval on the FEMA Loan[7] for several months. According to the Minutes, the Association incurred approximately $40,000 in damage from the hurricanes, of which, the insurance reimbursed approximately $16,000.00 which would leave a need for approximately $28,000.00, funds that the Association already had in its account. The Minutes also state, "Over the past several months, the Board has been working diligently on getting FEMA Loan Approval. We have been approved for the FEMA Loan with one remaining issue. To get the loan, we will need $25.00 over and above the monthly Maintenance Fee and Utility Bill from each member, for the next 10 years." There was no mention that the Loan Authorization and Agreement required membership approval or that the loan amount was for $108,600. The owners were not provided with the required two weeks written notice (as required by Florida Statute) before calling the July 30, 2005 [sic] in which the assessment/FEMA loan was to be discussed. Furthermore, the Board and its Management failed to inform the owners during the meeting that they had signed a Loan Authorization and Agreement on [sic] several months earlier, on April 15, 2005.
>
> . . .
>
> Although Eldist Marie Lewis resigned on July 30, 2005, she and Miriam Coates signed a Resolution of Board of Directors to get [sic] loan in the amount of

---

6 The factual background section of Crenshaw's Motion routinely switches between first and third-person narrative. Given the timeline of the events described, the first-person statements presumably refer to actions taken by Crenshaw and not the attorney who filed Crenshaw's Motion.

7 The Board's minutes and resolutions describe the loan as a "FEMA" loan, apparently referring to the Federal Emergency Management Agency. However, the SBA was the actual lender. (*See* Doc. No. 67-2 at 1.)

> $108,600.00 signed by. [sic] Again, none of the owners have been made aware of the amount and certain Board Members were not privy to the information either.

(Doc. No. 69 at 5-6 (citing Composite, Ex. 10-15; Ex. 5-7) (internal citations omitted).)

Crenshaw contends that the Board then passed the first of two resolutions that were aimed at satisfying the Loan Agreement:

> On September 5, 2005, the first Resolution was signed by Larry Duggan, President and Donna Hickey, Secretary. Section 1 of the resolution states that "there will be a FEMA Loan or Special Assessment in the amount of $50,000 . . ." Section 2 states "the assessment shall be due on November 1, 2005, and shall be delinquent thereafter. The assessment may be paid in full on or before the due date, without penalty, by paying $1,042 on or before December 1, 2005 or $25.00 each month for the next 10 years." Section 3 states "the majority of owners will rule as to the choice of FEMA Loan or Special Assessment."

(*Id.* at 6.) According to Crenshaw, on September 6, 2005, "only one day after the first fraudulent resolution was adopted and handwritten ballots were mailed to the owners, DeGayner wrote a letter to Larry Duggan, former President of the Board[,] [in] which she indicated that the Board would seek the loan without the vote of the membership . . . ." (Doc. No. 69 at 6-7 (citing Ex. 10-b).)[8] Crenshaw contends that a majority of the owners "voted against the FEMA loan." (*Id.*)

On September 12, 2005, Crenshaw sent a letter to Duggan, then president of the Board, stating that she had voted "no"on the ballot. (*Id.* at 7 (citing Ex. 10-c).) She also informed Duggan that the Board had failed provide the owners with the required fourteen day notice that the meeting was to be held. (*Id.*) Next, Crenshaw states that "[i]n late-September 2005, a second Resolution was signed by Larry Duggan, President and Donna Hickey, Secretary. This document, which was

---

[8] The Court was unable to locate an exhibit "10-b" in the materials submitted by Crenshaw. Although an exhibit 10 existed, it constituted one document and was not subdivided. Accordingly, the Court instructed Crenshaw to designate where in the record the exhibit appeared. (Doc. No. 104.) Crenshaw filed a new copy of the exhibit as Document Number 106-2.

actually sent to SBA[,] is significantly different from the one sent to the owners. Section 1 no longer contains the language about the $50,000.00 and Section 3 was removed and no longer requiring [sic] a majority of owners to rule." (*Id.* (citing Composite, Ex. 26-27; Ex. 10-d.).)

Crenshaw states that this resolution was contrary to the condominium bylaws because:

> Article II, Section 2(b) states, "Two-Thirds of the Unit Owners' total votes shall decide any question, unless the Declaration of Condominium, By-Laws or Articles of Incorporation Association provides otherwise." And even if the Association argued that it did not need two-thirds vote, the Association would still be bound by Article VI, Section 4(b) which clearly requires a majority vote when an assessment. [sic] None of the requirements of this section of the by-laws were met by the Association, including notice to the unit owners.

(Doc. No. 69 at 8 (citing Composite, Ex. 20-21; Ex. 10-e).)

On November 28, 2005, Lewis sent a letter to the SBA stating that the Board had passed a resolution of its members to approve the loan, and that the community was in "dire need of these funds." (Doc. No. 69 (citing Composite, Ex. 95-96; Ex. 19).)

On January 14, 2006, Crenshaw contends that the Board held an "informational" meeting during which she informed the Board and its attorney that the ballots were insufficient to "move forward with the FEMA loan." (*Id.* at 10.) Then, according to Crenshaw, "[o]n January 16 and 17, 2006, Marie Lewis and Carol Blackman signed [a] second copy of the signed copy Loan Authorization and Agreement without the knowledge of the full Board or Owners."[9] (*Id.*)

Crenshaw further describes several pieces of correspondence that she sent to the Board demanding that it discontinue its effort to secure a loan, as well as a meeting during which the Board

---

[9] Crenshaw does not explain what she means by a "signed second copy of the signed copy Loan Authorization and Agreement."

allegedly refused to allow Crenshaw to see the "Resolution of Owners . . . in connection with the FEMA loan." (*Id.* at 11.) Crenshaw then concludes by stating the following:

> On August 8, 2006, Crenshaw sent an email to Nancy[10] regarding [sic] July 15, 2006 Board Meeting and reminding DeGayner that she did not receive approval from the owners to borrow the money. Crenshaw also disputed the debt claiming that I [sic] owe $1,042.00 for the loan. A copy of this email is attached hereto as Ex. "47".[11]
>
> . . .
>
> On September 17, 2006, Crenshaw sent a letter to LGF responding to September 13, 2006 correspondence informing him that the loan was "unauthorized and fraudulent".[12] A copy of this letter is attached hereto as Ex. "55".
>
> . . .
>
> On September 19, 2006, Crenshaw sent a letter to LGF, once again spelling out the reasons why I [sic] dispute [sic] bill for the assessment. Crenshaw informed the firm that the ballots did not reflect a majority of the vote and therefore the Association was not authorized to borrow money from the SBA. A copy of the letter is attached hereto as Ex. "57".

(*Id.* at 12-13 (punctuation as in original).)

Neither Crenshaw nor Defendants specify when the Board actually submitted the allegedly "fraudulent" resolutions to the SBA. However, the date of the final resolution, the date of an attorney opinion letter concerning the resolution, and the date that the actual loan was received by the Board suggest that the resolutions were sent to the SBA sometime between March and June of 2006. (*See* Doc. No. 67-3 at 2-4.)

Defendants dispute Crenshaw's account in several respects. First, Defendants contend that the Board relied upon an attorney's written opinion that the Board had complied with the requirements of the Loan Agreement. (Doc. No. 67 at 7 (citing 67-3 at 3).) Next, Defendants argue

---

[10] Presumably, Defendant Nancy Degayner.

[11] Again, the Court assumes that the use of "I" is a typographical error and actually refers to Crenshaw.

[12] "LGF" appears to refer to a law firm retained by the Board, LandisGrahmFrench.

that the community bylaws permit the Board to make a special assessment in the same manner as a regular assessment, which does not require the vote of the homeowners. (*Id.* (citing Doc. No. 67-5).) Defendants concede that the Loan Agreement required approval by a "sufficient majority" of owners, but they argue that at least twenty-eight of the forty-eight owners voted to approve a special assessment in the amount of $1,024.00. (*Id.* at 8.)

The parties also vigorously dispute the exact amount borrowed by the Board. Crenshaw contends that the Board borrowed $80,000, while Defendants contend that the Board initially borrowed $80,000 and immediately paid back $30,000. (Doc. No. 67 at 4; Doc. No. 69 at 18.)

**C. The Lien on Crenshaw's Unit and Alleged Harassment**

Crenshaw refused to pay her portion of the special assessment, and as a result, the Board imposed a lien on her property. (Doc. No. 69 at 20 (citing Composite, Exs. 19-21, 103-104).)

Crenshaw also contends that she was subjected to harassment by Defendants in the form of letters and signs posted outside her unit. Her Response to Defendants' Motion for Summary Judgment provides the following explanation:

> Relator[13] was subjected to relentless abuse, including property damage by Nancy DeGayner and Kass Genneken. Additionally, Relator disclosed [sic]expert witness report to Defense Counsel which identified the above named Defendants as the author [sic] of numerous letters mailed to Relator which contained harassing and racially derogatory comments (C@ 34, 40, 43, 44, 50, 55, 75, 78, 79 & 108). In fact, at her deposition, Crenshaw identified and attached a picture of the pick-up truck owned by Genneken with similar signs in the truck's window directed at Plaintiff (C @113). This handwriting was matched with other derogatory writings sent to Plaintiff. Although the Defendants did mail letters to Relator's family members and friends which referred to Relator as a "low-down nasty Nigger", "whore", "slut" and

[13] The term "relator" refers to an informant who furnishes the information necessary to prosecute a False Claims Acts action. *See* Black's Law Dictionary 1315 (8th ed. 2004). Although Crenshaw brings her claim for intentional infliction of emotional distress on her own behalf, the Court assumes that the term "relator" is meant to refer to Crenshaw in this context.

> many other derogatory terms, the vast majority of the letters were mailed directly to Relator at her home or to The Pine Hills News where Relator served as Vice President, President, Secretary, and Editor and addressed her directly. (See Plaintiff's Affidavit attached hereto as Ex. "1").
>
> A detailed explanation of the extreme and outrageous conduct of the Defendants is provided in Plaintiff's Affidavit attached hereto as Ex. "1". Additionally, Plaintiffs' Counsel has submitted a public records requests [sic] to the appropriate law enforcement agencies in [sic] for the purpose of gaining access to the original documents in order to have fingerprinting and/other testing done on those items.

(Doc. No. 82 at 17 (punctuation left as in original).) Crenshaw also describes a sign which was left on the door of her friend's condominium and apparently refers to a book that Crenshaw authored:

> Online Dating is a seductive, trashy novel. The story is set in Daytona Beach, Florida and is targeted for the adult beastiality [sic] reader. Cheap Chocolate is the whore's name and by the story's main character who is an uneducated, low-down, nasty nigger in her early forties. Cheap Chocolate is writing a candid letter to her prostitute friend, Ruth Hadyniak in Royal Palm Court Condo revealing her experiences with beastiality [sic]. Cheap Chocolate discovers quickly and to her surprise that the majority of the dogs she fucked had rabies.[14]

(Doc. No. 82 at 19.)

Defendants contend that "there is no evidence in the record that would indicate which individuals are responsible for the alleged harassment." (Doc. No. 67 at 13 (citing Doc. No. 68-2 at 12, 14; Doc. No. 68-4 at 4).)

**Standard of Review**

A party is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled judgment as a matter of law." Fed. R. Civ. P. 56(c); *accord Anderson v.*

---

[14] Crenshaw does not explain how this sign relates to her or whether it unfairly characterizes the book she authored.

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259 (11th Cir. 2004). An issue of fact is "material" if, under the applicable substantive law, it might affect the outcome of the case. *Hickson Corp.*, 357 F.3d at 1259. An issue of fact is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party. *Id.* at 1260. A court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.*; *Anderson*, 477 U.S. at 251-52.

The party moving for summary judgment has the burden of proving that: (1) there is no genuine issue as to any material fact, and (2) it is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In determining whether the moving party has satisfied its burden, the court considers all inferences drawn from the underlying facts in the light most favorable to the party opposing the motion and resolves all reasonable doubts against the moving party. *Anderson*, 477 U.S. at 255. The court may not weigh conflicting evidence or weigh the credibility of the parties. *Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 919 (11th Cir. 1993). If a reasonable fact finder could draw more than one inference from the facts and that inference creates an issue of material fact, a court must not grant summary judgment. *Id.* On the other hand, summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.

## Analysis

### I. Preliminary Issues and Objections to Evidence

#### A. Supporting Citations

A number of factual assertions in Crenshaw's Motion for Summary Judgment and Response in Opposition to Defendants' Motion for Summary Judgment contain no citation to evidence in the record. (*See, e.g.*, Doc. No. 69 at 3, 10, ¶¶ 7-11, 30-31; Doc. No. 82 at 3 ("[T]he roofs were repaired in February 2005 using the Association's reserve fund as well as proceeds received from the insurance company.").)

As Crenshaw notes in her Opposition to Defendants' Motion to strike her affidavit, the Case Management and Scheduling Order states the following in reference to motions for summary judgment:

> The memorandum in opposition shall specify the material facts as to which the opposing party contends there exists a genuine issue for trial, and shall be accompanied by affidavit(s) and other evidence in the form required by Federal Rule of Civil Procedure 56. Both the movant and the party opposing summary judgment shall provide *pinpoint citations* to the pages and lines of the record supporting each material fact. *General references* to a deposition are inadequate.

(Doc. No. 27 at 6 (emphasis added).) Additionally, courts may not consider the unsupported argument of counsel as evidence, *United States v. Smith*, 918 F.2d 1551, 1562 (11th Cir. 1990), and the nature of the adversarial system of justice discourages courts from acting as an advocate by *sua sponte* identifying issues of fact for a party. *E.g.*, *L.S. Heath & Son, Inc. v. AT & T Info. Sys. Inc.*, 9 F.3d 561, 567 (7th Cir. 1993) ("[A] district court need not scour the record to determine whether there exists a genuine issue of fact to preclude summary judgment. Instead, the court can rely upon the non-moving party to show such a dispute if one exists."); *Impreglon, Inc. v. Newco Enters., Inc.*, 508 F. Supp. 2d 1222, 1241 n. 6 (N.D. Ga. 2007) ("[I]t is not the Court's duty to comb the record

in an attempt to find reasons to grant Plaintiff's Motion for Summary Judgment."); *see also Tomasini v. Mount Sinai Med. Ctr. of Fla., Inc.* 315 F. Supp.2d 1252, 1260 n.11 (S.D. Fla. 2004); *BFI Waste Sys. of. N. Am. v. DeKalb County, Ga.*, 303 F. Supp. 2d 1335, 1342 n.5 (N.D. Ga. 2004).

Although the Court has carefully reviewed all of the evidence on file, in accordance with the Case Management and Scheduling Order, it will not consider any factual arguments made by either party that are not supported with evidence and specific citations to the record. (*See* Doc. No. 27 at 6.)

**B. Objections to Evidence**

Defendants moved to strike Crenshaw's Affidavit, arguing that it is "replete with conclusory statements, legal conclusions, opinions as to the state of mind of Defendants and 'evidence' which would not be admissible at trial." (Doc. No. 86 at 1.) Crenshaw responded, noting that Defendants specifically objected to nine of the paragraphs in her affidavit: paragraphs 8, 11, 16, 17, 22, 40, 44, 47, and 50. (Doc. No. 88 at 1.) The United States Magistrate Judge denied Defendants' Motion without prejudice, holding that "[t]he presiding district judge will determine whether and to what extent the averments in the affidavit are sufficient to support the response to the motion for summary judgment when ruling on the motion." (Doc. No. 103.) Accordingly, "[t]he Court will disregard, rather than strike," inadmissible statements from the Affidavit. *Munnings v. Fedex Ground Package Sys., Inc.*, No. 6:07-cv-282-Orl-19KRS, 2008 WL 1849003, at *5 (M.D. Fla. Apr. 22, 2008). "Furthermore, the Court will apply the Federal Rules of Evidence to [this] Affidavit[] and will exclude from its consideration those statements that violate such Rules."[15]

---

[15] Plaintiff's Response to Defendants' Motion for Summary Judgment contains only general citations to her affidavit and does not cite any of these particular paragraphs. (*See* Doc. No. (continued...)

## II. Defendants' Motion for Summary Judgment

### A. False Claims Act

The False Claims Act, 31 U.S.C. §§ 3729-33, authorizes private citizens to file a civil action and recover damages on behalf of the United States against any person who:

> (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval;
> (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; [or]
> (3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid . . . .

31 U.S.C. § 3729. These provisions apply to false information submitted to the government for the purpose of procuring a government-sponsored loan. *See, e.g.*, *United States v. Woodbury*, 359 F.2d 370, 379 (9th Cir. 1966); *United States ex rel. Purcell v. MWI Corp.*, 520 F. Supp. 2d 158, 165-65, 178 (D.D.C. 2007).

Defendants raise two arguments in support of their Motion for Summary Judgment. First, Defendants contend that Crenshaw has failed to present any evidence that Defendants "knowingly" submitted false information to the SBA for purposes of procuring the loan. (Doc. No. 67 at 5-9.) Second, Defendants argue that Crenshaw cannot proceed under the False Claims Act because she has failed to demonstrate that the government suffered an "injury in fact."[16] (*Id.* at 9-11.)

---

[15](...continued)
82 at 1-20.)

[16] Defendants do not raise the issue of whether there is sufficient evidence that Degayner and her management company made false claims to the government since neither were signatories to the Loan Agreement or had voting power on the Board. Also, Defendants do not raise the issue of whether the facts of this case implicate the law regarding "promissory fraud" under the False Claims Act and the requirement that a false promise be sufficiently material to induce the government to make a payment. *See, e.g., U.S. ex rel. Hopper v. Anton,* 91 F.3d 1261, 1267 (9th Cir. 1996). Accordingly, the Court will not address these issues.

Under the Act, "knowingly" means a person who "(1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required." 31 U.S.C. § 3729(b); *United States ex. rel. Clausen v. Lab. Corp. of Am.*, 290 F.3d 1301, 1309 n.12 (11th Cir. 2002).

In her Motion for Summary Judgment, Crenshaw claims that the Board presented "two" false claims to the government by submitting the Loan Agreements on April 15, 2005 and in January of 2006. (Doc. No. 69 at 15.) However, she later states that Defendants also submitted a "fraudulent resolution dated March 3, 2006 which caused the SBA to disburse $80,000 to the Association."[17] (*Id.* at 15-16.) Reading together Crenshaw's Motion, her Response to Defendants' Motion for Summary Judgment, and the Second Amended Complaint, it appears that Crenshaw contends that the Board made two categories of false claims: (1) agreeing through their signing of the Loan Agreement that the Board will use the loan proceeds for hurricane repairs; and (2) forwarding to the SBA several resolutions which stated that the Board received approval by a majority of homeowners. (*See* Doc. No. 41, ¶¶ 48, 50, 51, 54-55.)

**1. Use of the Money**

Crenshaw's Motion for Summary Judgment and her Response to Defendants' Motion for Summary Judgment contain several allegations that the Board did not use the loan money for the purposes stated in the Loan Agreement. (Doc. No. 69 at 9 ("In fact the two roofs which were replaced with FEMA [sic] funds in July 2006 were not damaged because they had been repaired at

---

[17] Crenshaw then states that "it is undisputed that Defendants presented two (2) false claims to the SBA[.]" (Doc. No. 69 at 16.) Defendants disagree and take exception to Crenshaw's claim that the falsity of their submissions is undisputed. (Doc. No. 81 at 1.)

the same time the remaining four were replaced for $32,000, half of which was paid by insurance." (citing Composite, Ex. 95-96; Ex.19)); *id.* at 15 (referring to an affidavit that was signed by Lewis concerning the Board's ability to pay "Wayne's Sheet Metal" (no citation)); *id.* at 17 (claiming that the "two roofs replaced with FEMA funds were not damaged" (citing Ex. 19)); Doc. No. 82 at 3 ("[T]he roofs were repaired in February 2005 using the Association's reserve funds as well as proceeds received from the insurance company." (no citation)); *id.* ("Defendants' claim that 'Royal Palm needed funds from the SBA to properly re-fund its reserves accounts' is simply not true." (no citation)).)

The Loan Agreement requires the borrower to "use the proceeds of this Loan solely to rehabilitate or replace property of Borrower . . . damaged or destroyed by disaster occurring in the month of September, 2004." (Doc. No. 67-2 at 2.) The agreement then listed two specific uses: "repair/replace disaster damaged real estate . . . ." and "disaster clean-up and debris removal expenses." (*Id.*) Crenshaw appears to argue that the Board's use of the money was inconsistent with the Loan Agreement because (1) two of the repaired roofs had already been repaired, and (2) the Board was not permitted to replenish its reserve account with the loan money.[18] Defendants argue that the money was used to make repairs made necessary by the hurricanes. (Doc. No. 67 at 4.)

Defendants are correct. Crenshaw offers no admissible evidence that Board used the loan money to repair roofs that were not damaged by the hurricane. In support of her claim, Crenshaw cites a "letter" sent from Lewis to the SBA on November 28, 2005. (Doc. No. 69 at 9.) However,

---

[18] Crenshaw spends much of her Motion for Summary Judgment and her Response to Defendants' Motion for Summary Judgment discussing how much money Defendants intended to borrow. (*See, e.g.*, Doc. No. 82 at 2.) However, she never articulates how the "confusion as to the loan amount" constitutes a violation of the False Claims Act. Accordingly, the Court considers this evidence as relevant to the issue of damages, but not to the issue of liability for making a false claim.

the letter offers no support for Crenshaw's claim. The letter concerns whether the Board had sent the loan closing documents to the SBA by the applicable deadline and explains the Board's "dire need" for the funds. (Doc. No. 67-2 at 8.) It does not address the Board's intended use of the loaned money.[19]

Likewise, there is no evidence that the Board violated the Loan Agreement by replenishing the reserve account. In her Response to Defendants' Motion for Summary Judgment, Crenshaw states the following:

> The Defendants' claim that "Royal Palm needed funds from the SBA to properly re-fund its reserves accounts" is simply not true. Aside from the fact the Defendants informed the SBA that the purpose for the loan was to "repair/replace damaged property located at 1290 9th Street, Daytona Beach, FL 32117"; [sic] the Defendants had no authority to borrow money to replenish the funds without the approval of the owners.

(Doc. No. 82 at 3.) Crenshaw does not cite where in the record Defendants made this "claim," but she is presumably referring to page four of Defendants' Motion for Summary Judgment, where they state:

---

[19] Crenshaw also states that:

> Further evidence of the Defendants' knowledge and intent to defraud the government is indicated in the sworn Affidavit which was prepared by Nancy DeGayner (less than 30 days after signing her management contract) and signed by Lewis on February 10, 2005. (Affidavit attached as Ex. "2" of Plaintiff's depo). In this Affidavit, Lewis swears, "That there are sufficient funds in the Royal Palm Court Condominium HOA, Inc. account to pay Wayne's Roofing and Sheet Metal in full." The Affidavit also swears, "That this will not cause a special assessment to be placed on any of the Condominium Units."

(Doc. No. 82 at 8.) Crenshaw does not state why this affidavit is evidence of "knowledge and intent to defraud," and no such inference is obvious to the Court. Crenshaw does not explain whether "Wayne's Roofing and Sheet Metal" was the only company to do repairs in the community, or why the language regarding the special assessment renders the Board's acceptance of the Loan Agreement a false claim.

> Because of a shortfall of funds from the insurance proceeds, Royal Palms was in dire need of the funds to make repairs that have been caused by [the September 2004] hurricanes. Although the repairs that were necessary to prevent water intrusion were made almost immediately, Royal Palm needed funds from the SBA to properly re-fund its reserve accounts, which had not been specifically set aside for such an emergency.

(Doc. No. 67 at 4 (citations omitted).) Crenshaw also describes a Board meeting on July 15, 2006, as follows:

> On July 15, 2006, the Board held a meeting in which the minutes state, "On June 21, 2006 we received a wire transfer in the amount of $80,000.00 from SBA. Upon the advice of our attorney, LandisGrahamFrench (LGF), we returned $30,000.00 to SBA Dept. of Treasury on July 3, 2006 as our request had been for $50,000.00. The $50,000.00 will be deposited into our reserve account." DeGayner contacted SBA in May 2006 to request the additional $30,000.00. The minutes also state, "Donna Hickey made a motion, Carol Blackman seconded to ladder the CD's in the Reserve Account." A copy of the Minutes is attached hereto as Ex. "46". The funds being held in a CD are the same funds collected from the owners in connection with the FEMA Loan and is a violation of Section 2(B)(4) of the Loan Authorization and Agreement which requires that "The proceeds of the assessment will be assigned by the association to SBA as collateral for this Loan (C @ 26-28)

(Doc. No. 69 at 12 (punctuation as in original).

Crenshaw fails to articulate how the replenishment of the Board's reserve account amounts to evidence that the funds were used for something other than repairing hurricane damage. Simply put, the evidence presented gives no reason to believe that the Board's decision to deposit money into the reserve account precluded it from later spending the money on hurricane repairs. In fact, the passage Crenshaw relies on from Defendants' Motion for Summary Judgment suggests that the community needed funds from the SBA for this very purpose because the fund "had not been

specifically set aside for such an emergency." In addition, the minutes from the July 15, 2006 meeting state that the Board planned to pursue additional roof repairs. (Composite, Ex. 46.)[20]

In sum, there is no evidence that the Board took the loan money and spent it in a manner inconsistent with the Loan Agreement.[21] Accordingly, the Plaintiff has failed to carry her burden to prove that the Board knowingly made a false claim by agreeing that the loan proceeds would be used to repair hurricane damage.

**2. Failure to Obtain Majority Approval of the Homeowners**

Crenshaw next argues that the Board was required to obtain approval from a majority of homeowners before agreeing to the SBA loan. It is undisputed that the Loan Agreement required the Board to pass a resolution that "provide[s] that the special assessment was approved by a sufficient majority of the association's general members at a meeting held for that purpose." (Doc. No. 67-2 at 1.) Defendants appear to concede that this provision required the Board to obtain approval from a majority of homeowners, despite their contention that the community bylaws do not require a vote of the general membership to levy a special assessment or borrow money. (Doc. No. 67 at 8.) Thus, as postured, the parties' arguments present two distinct issues: first, whether the

[20] Crenshaw has not presented evidence that the Board simply deposited the money into its reserve account for the purpose of holding onto the money for future needs unrelated to the hurricane damage. Whether such an action would render the Board's statements to the SBA concerning use of the funds "knowingly" false might be a closer question because the Loan Agreement prohibits the borrower from spending the loan proceeds on expenditures unrelated to damage from the September 2004 hurricanes. (*See* Doc. No. 67-2 at 2.)

[21] Crenshaw also fails to explain why depositing the money collected from the special assessments into CDs violates Section 2(B)(4) of the Loan Agreement. This section assigns the "proceeds of the assessment" to the SBA "as collateral for the loan." Crenshaw does not point to any section in the Loan Agreement or any other authority prohibiting a debtor from investing collateral in an interest-bearing account. In any event, the minutes merely state that the Board will "ladder the CD's in the Reserve Account," and it is unclear how this statement is related in any way to the special assessment that was imposed for purposes of repaying the SBA loan.

Board violated the Loan Agreement by failing to get a majority vote and second, whether the Board made a knowingly false statement by submitting a resolution stating that a majority of owners had approved the loan.

**a. Whether the Board's Actions Violated the Loan Agreement**

Crenshaw argues that the Board lacked a majority vote because seventeen owners voted for the loan, and the remaining thirty-one owners voted "not to borrow money." (Doc. No. 82 at 7.) Thus, Crenshaw contends, "Defendants are essentially arguing they did not know how to count to 48 or that they did not know a majority vote required at least 25 votes and a two-third [sic] majority required 32 votes." (*Id.*) Defendants, on the other hand, appear to argue that the Board obtained a sufficient majority because at least twenty-eight of the forty-eight owners voted to approve a special assessment in the amount of $1,024.00. (Doc. No. 67 at 8.) Defendants do not spell out how twenty-eight votes in favor of a special assessment amounts to approval of the *loan* by a "sufficient majority." However, their logic appears to be based on their contention that the Board planned to pay back the "FEMA loan" by imposing a special assessment of $1,024.00 per unit. (*Id.* at 5, 8.) As a result, either option on the ballot resulted in a $1,024.00 special assessment. (*Id.*)

Neither position is supported by actual facts in the record. The Loan Agreement required approval from a "sufficient majority" of homeowners. (Doc. No. 67-2 at 1.) The term "sufficient" is vague and left undefined. However, the Loan Agreement itself only requires a "majority" approval and does not elaborate further. Thus, the adjective "sufficient" implies that the "majority" obtained must satisfy some other applicable requirement such as the community bylaws or state law. In this case, the bylaws contain several provisions relevant to voting.

Although homeowners are not entitled to vote on all matters, the bylaws contain special rules that govern the procedure when the owners are given an opportunity to vote. Section 2 of the bylaws provide that "[t]wo-Thirds of the Unit Owner's total votes shall decide any question, unless the Declaration of Condominium, By-Laws or Articles of Incorporation of the Association provides otherwise."[22] (Doc. No. 67-5 at 2.) Section 3 of the bylaws states that "unless otherwise provided in these By-laws, the presence in person or by proxy of a majority of the Unit Owners' total votes shall constitute a quorum." (*Id.*) Thus, the bylaws required the Board to receive approval by two-thirds of a quorum.

However, neither party has provided enough evidence concerning the outcome of the election to give the Court a coherent picture of what occurred. Defendants introduce no evidence whatsoever concerning this issue. On the other hand, Crenshaw submitted copies of twenty-three ballots as evidence in opposition to Defendants' Motion for Summary Judgment. (Doc. No. 83-3 at 6-29.) Sixteen of these ballots select the "FEMA loan," and seven select the special assessment. (*Id.*)

---

[22] Crenshaw appears to interpret this provision, particularly the term "any," as requiring a two-thirds vote to approve *all actions* taken by the Board. (Doc. No. 69 at 8.) Her position ignores later provisions in the bylaws allowing the Board to take any action that is not specifically reserved for homeowners. (Doc. No. 67-5 at 9.) Other sections of the bylaws, such as Article IV, section thirteen, and Article VI, section 4(a), allow the Board to unilaterally impose assessments. (*Id.* at 10; Doc. No. 67-6 at 4 ("The Board is specifically empowered, on behalf of the Association, to make and collect assessments . . . . ").) Moreover, her position would nullify the executive function of the Board, and the requirement that a super-majority of homeowners approve all community decisions would pose a serious obstacle to carrying out efficient governmental action. *See, e.g.*, John O. McGinnis & Michael B. Rappaport, *Majority and Supermajority Rules: Three Views of the Capitol*, 86 Tex. L. Rev. 1115 (2007). Accordingly, the most reasonable interpretation of the bylaws is that homeowner approval of Board action is required when specifically stated in the bylaws, required by law, or in this case, required by a loan agreement.

In addition, Crenshaw cites section 718.112(f)(3)-(4) of the Florida Statutes as authority that the Board must obtain majority approval before borrowing money. This statute requires a board to obtain majority approval before using reserve funds for non-authorized uses, and Crenshaw does not explain how the statute concerns the Board's authority to borrow money or impose assessments.

However, this evidence is inconsistent with Crenshaw's own argument that "a majority of members voted against the FEMA loan." (Doc. No. 69 at 6.)

Because Defendants are the moving party, the Court draws all inferences in favor of Crenshaw and finds that there is a genuine issue of material fact concerning whether the Board complied with the Loan Agreement by receiving approval of the loan by a sufficient majority.

**b. Whether the Board Knowingly Made a False Statement**

Nevertheless, the mere fact that the Board may have acted in a manner inconsistent with the Loan Agreement does not *ipso facto* establish that the Board "(1) ha[d] actual knowledge of the information; (2) act[ed] in deliberate ignorance of the truth or falsity of the information; or (3) act[ed] in reckless disregard of the truth or falsity of the information . . . ." 31 U.S.C. § 3729(b). The False Claims Act is not a strict liability statute. *United States ex rel. Fowler v. Caremark RX, L.L.C.*, 496 F.3d 730, 743 (7th Cir. 2007) ("[Relator's position] would transform every inaccurate claim into a false claim and consequently replace the Act's knowledge requirement with a strict liability standard."). Furthermore, the Act is not designed to "punish honest mistakes or incorrect claims submitted through mere negligence." *United States ex rel. Hefner v. Hackensack Univ. Med.*, 495 F.3d 103, 109 (3d Cir. 2007); *United States ex rel. Ervin & Assocs., Inc. v. Hamilton Secs. Group, Inc.*, 298 F. Supp. 2d 91, 102 (D.D.C. 2004) ("[I]innocent mistakes, mere negligence, or even gross negligence (without more) are not actionable under the False Claims Act."). Thus, when opposing summary judgment, a False Claims Act plaintiff must at a minimum produce some evidence from which a court can infer that the defendant had "actual knowledge," "deliberate ignorance," or "reckless disregard" of the truth or falsity of the information presented in its claim to the government. *See United States ex rel. Hefner*, 495 F.3d at 109-110.

Under these principles, summary judgment in favor of Defendants is warranted. The Eleventh Circuit has explained, "[w]here the circumstantial evidence and reasonable inferences drawn therefrom create a genuine issue of material fact for trial, summary judgment is improper." *CBS Broadcasting, Inc. v. Echostart Commc'ns*, 450 F.3d 505, 518 n.25 (11th Cir. 2006). "However, an inference based on speculation and conjecture is not reasonable." *Id.* Moreover, summary judgment is appropriate where the facts are "so one-sided that one party must prevail as a matter of law." *Hickson Corp.*, 357 F.3d at 1260.

Such is the case here. Crenshaw does not present any direct evidence of the Board's intent. *C.f.*, *United States ex rel. Hendow & Anderson v. Univ. of Phoenix*, 461 F.3d 1166, 1175 (9th Cir. 2006) (employees "bragging" about ignoring federal regulations). Instead she appears to argue that an inference of knowledge of falsity[23] should be drawn from several sources of evidence. However, this inference of knowledge is insufficient to survive summary judgment for two reasons.

**i. Whether a Reasonable Inference can be Drawn from Crenshaw's Evidence**

To begin, the inference that Crenshaw advocates cannot be reasonably drawn from the evidence she presents. Crenshaw first argues that knowledge should be inferred by the Board's "deception and secrecy." In her Response to Defendants' Motion for Summary Judgment, Crenshaw states:

> [T]hrough deception and secrecy on September 5, 2005, September 28, 2005, and on March 3, 2006, despite not having the required two-thirds of homeowners who voted for the loan or the assessment needed to secure the loan, RPC passed resolutions through its board of directors, all stating that there would be an assessment to pay back the "FEMA loan." Thereafter, Defendants forwarded a

[23] When discussing "knowledge of falsity," the Court is referring to "knowledge" as defined in 31 U.S.C. section 3729(b) and discussed earlier in this Order.

> certified copy of a resolution to the SBA which falsely stated the homeowners passed a special assessment according to the association rules, as required in the Loan Agreement.

(Doc. No. 82 at 7.) Earlier in the same Response, Crenshaw also states that "Defendants . . . failed to mention they were fined by DBPR[24] in September 2006 and subsequently entered into a Consent Order with DBPR for failure to provide the owners with access to the Association's records which was a part of Defendants [sic] efforts to conceal their fraudulent activities from Plaintiff." (*Id.* at 6.) Crenshaw argues that this evidence of "deception" proves Defendants' knowledge of falsity. (*Id.* at 7-8 (citing *United States ex rel. Hopper*, 91 F.3d at 1266); *United States ex rel. Hendow & Anderson*, 461 F.3d at 1166).)

However, this "evidence" does not support an inference of knowledge. First, Crenshaw's observations of "deception" and "secrecy" appear to be subjective observations that are inconsistent with the Board's minutes and other evidence Crenshaw submitted.[25] *Leigh v. Warner Bros., Inc.*, 212 F.3d 1210, 1217 (11th Cir. 2000) (conclusory allegations based on subjective beliefs are insufficient to create a genuine issue of material fact). Although Crenshaw alleges (without an adequate supporting citation to the record) that the Board was fined for failing to provide Crenshaw with access to books and records within five working days of her request, she does not explain how the Board's failure to provide access was linked to the alleged fraud in this case. Particularly,

---

[24] Presumably, the Florida Department of Business and Professional Regulation.

[25] The "minutes" from the various meetings reveal that Crenshaw was, in fact, involved in the meetings and that her concerns were addressed, albeit not always with agreement, by the Board members. (*See, e.g.*, Composite, Ex. 11.)

Crenshaw does not contend that the Board was fined for withholding materials concerning the Loan Agreement.[26]

Crenshaw next argues that knowledge should be inferred from: (1) the fact that Degayner is a licensed real state agent and community association manager "and clearly knew that a majority vote had not been received"; (2) the Board's failure to provide the owners with 30-days' notice that the budget would be increased; (3) Crenshaw's petition asking the Board to hold a special meeting and a letter from Degayner informing Crenshaw that she did not have enough signatures on the petition because Degayner removed a name due to "misrepresentation"; and finally, (4) the Board's general failure to get approval from a majority of homeowners. (Doc. No. 82 at 8-11.) Crenshaw summarizes by stating: "Clearly, the Owners should have known and should have had some say in whether or not their property interest would be mortgaged to the Federal Government.[27] The Defendants [sic] actions were wanton and in reckless disregard to the rights of the Owners." (Doc. No. 82 at 10.)

Essentially, Crenshaw asks the Court to infer knowledge of falsity from the Board's alleged failure to comply with the community's bylaws. Again, however, Crenshaw fails to articulate why

---

[26] The Court's own review of the DBPR's letters and consent order did not reveal any reference to the books and records that might be relevant to the issues in this case. (*See* Doc. No. 83-3 at 31-39.)

Crenshaw also relies on a letter which purportedly "den[ies] the existence of the Loan Agreement signed on April 15, 2005." (Doc. No. 82 at 5 (citing Doc. No. 67-4 at 4-5).) However, Crenshaw does not explain why this letter is probative of the Board's intent to defraud the government and no such inference is obvious to the Court. (*Id.*) At most, the letter appears to concern confusion over when the Loan Agreement was signed. (*Id.*)

[27] The Loan Agreement does not "mortgage" the owners' property interests. As described above, the pledged security interest is a right "to receive and collect proceeds arising pursuant to any and all special assessment and any other assessments, levied by Debtor to amortize and repay Debtor's loan from Secured Party and all accounts and/or general intangible arising from such assessment(s)." (Doc. No. 67-2 at 1.)

this inference should be drawn, and no such reason is obvious to the Court. As Crenshaw's concluding statement illustrates, this evidence concerns the Board's disregard for the owners, not its alleged intent to defraud the government.

In addition, Crenshaw states in her Motion for Summary Judgment:

> On September 6, 2005, only one day after the first fraudulent resolution was adopted and handwritten ballots were mailed to the owners, DeGayner wrote a letter to Larry Duggan, former President of the Board which she indicated that the Board would seek the loan **without the vote of the membership** [her emphasis]. The majority of members voted against the FEMA loan. (C @ 21-24) This demonstrates DeGayner's clear intention violating the Loan Authorization and Agreement and the votes of members.

(Doc. No. 69 at 6-7 (punctuation and emphasis as in original).) However, when quoted in context, the letter reveals no such intent. Degayner states: "The board of administration has the authority to borrow funds from a bank or other lending institution, and to levy a special assessment to repay the loan without the vote of the membership. The board must seek membership approval only when it seeks to borrow from the community's already existing reserve account (§ 7-D-23.04(2) (d), F.A.C.)." (Doc. No. 106-2 at 1 (punctuation as in original).) The quoted language does not discuss the Loan Agreement, and it has no bearing on the Board's alleged intention to defraud the government. In any event, the first sentence of the paragraph states: "We are soliciting the members for a choice in the matter." (*Id.*) As such, the letter supports the opposite inference: that Degayner thought no majority vote was required but planned to obtain one anyway.

Crenshaw also argues in her Motion for Summary Judgment that the first allegedly fraudulent resolution contained language that the loan was approved by a majority of homeowners, while the second allegedly fraudulent resolution omitted the same language. (Doc. No. 69 at 16-17.) Crenshaw contends that Degayner removed the language because the Board had failed to receive

a sufficient majority vote. (*Id.*) Crenshaw alludes that this omission constitutes evidence that the Board knew that it had failed to comply with the Loan Agreement's requirement that the loan be approved by a sufficient majority of homeowners. (*Id.*) However, Crenshaw then states:

> [O]n March 3, 2006, Defendants passed and filed another resolution which fraudulently stated "a majority of said membership voted to approve and accept the loan for $108,600.00."[28] (See Ex. D. to Original Complaint) Although this resolution is patently false in that Defendants never received a majority approval of membership for the loan, this resolution proves unequivocally Defendants knew a majority was needed, and still filed a the [sic] false loan with false resolutions with the SBA.

(Doc. No. 69 at 17 (punctuation as in original).)

Thus, Crenshaw attempts to draw the same inference from both the omission and inclusion of language regarding approval by majority vote. The argument is contrary to logic. If Defendants intended to conceal their failure to obtain a majority approval by omitting language concerning majority approval from the second resolution, they would not have included the previously omitted language in the third resolution.[29] Accordingly, the Court cannot draw an inference of knowledge from Defendants' inclusion, omission, and then inclusion of language regarding majority approval.

Finally, this is not a case where knowledge, deliberate indifference, or reckless disregard can be inferred from the mere failure to follow simple directions. The combination of the vague term "sufficient" in the Loan Agreement with a set of bylaws that would not typically require the

---

[28] The Resolution actually stated: "Whereas, a majority of said membership voted to approve and accept the aforesaid loan in accordance with the terms hereafter set forth . . . ." (Doc. No. 67-3 at 1.)

[29] To the extent Crenshaw is attempting to draw an inference from the third resolution's *inclusion* of such language, the inference would only establish that the Board knew that it needed a majority vote to comply with the Loan Agreement, not that the Board knew that the actual vote that it had obtained was insufficient to constitute a "sufficient majority" under the terms of the Loan Agreement.

homeowners to approve a plan to borrow money or impose a special assessment presented the Board with a challenging matter of interpretation. Furthermore, as required by the Loan Agreement, the Board obtained an opinion letter from an attorney who stated that a special assessment "was duly approved and is binding upon the general membership of the association."[30] Such reliance on the opinion of an expert, coupled with a novel or confusing matter of interpretation, strongly negates inferring knowledge of falsity from evidence of the mere failure to comply with the government's instructions. *United States ex rel. Ervin & Assocs., Inc.*, 298 F. Supp. 2d at101-02 (finding no reckless disregard where the defendant relied on a scientific laboratory and a financial services to certify its compliance with government standards, and the plaintiff did not argue that the choice to subcontract was inappropriate). *C.f.*, *United States v. Newport News Shipbuilding, Inc.*, 276 F. Supp. 2d 539, 565-66 (E.D. Va. 2003) (explaining that reliance on advice of counsel may "contradict any suggestion that a [defendant] 'knowingly' submitted a false claim," but refusing to grant summary judgment on the issue of knowledge because genuine issues of material fact remained as to whether the defendant fully disclosed pertinent facts to its attorneys and fully implemented their advice).[31]

---

[30] Crenshaw emphasizes that the attorney's letter was procured *after* the Board adopted the allegedly "fraudulent" resolutions and therefore has no bearing on whether those resolutions were false claims. (Doc. No. 82 at 3, 14.) However, the Board did not submit "claims" to the government by adopting the resolutions; the "claim" was made when the resolutions were submitted to the SBA. The Loan Agreement required the Board to contemporaneously submit the attorney's letter with the resolutions to the SBA, and the letter is therefore relevant to the Board's intent when submitting the resolutions.

[31] Crenshaw argues, "Interestingly, the Defendants' [sic] do not assert [that] they provided the Attorney with copies of the Ballots. And surely if they had done so, the Attorney could have quickly discerned, without a shadow of a doubt, that the Defendants did not have the majority vote that they claimed." (Doc. No. 82 at 14.) However, the opinion letter states, "A special assessment, the terms of which are described in the [Loan Agreement] and incorporated herein by reference, was duly approved and is binding upon the general membership of the association." (Doc. No. 67-3 at 3.) It is unclear how the attorney could come to this conclusion without reviewing the

(continued...)

As a result, the evidence does not lead to an inference that the Board knowingly submitted a false claim to the government by stating in several resolutions that it had received a majority vote.

**ii. Whether the Inference Would be Sufficient to Survive Summary Judgment**

Moveover, any inference that could be drawn from Crenshaw's presented evidence would not be sufficiently "persuasive" to create a genuine issue of material fact in this case. The Supreme Court has explained that "when the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio*, 475 U.S. 574, 597 (1986). In the context of an antitrust case where the defendants were alleged to have conspired to charge below the market price, in other words a conspiracy with no obvious economic motive, the Court explained that factual implausibility requires non-moving parties to "come forward with more persuasive evidence to support their claim than would otherwise be necessary." *Id.*; *accord Cuesta v. Sch. Bd. of Miami-Dade County*, 285 F.3d 962, 970 (11th Cir. 2002) ("A court need not permit a case to go to a jury, however, when the inferences that are drawn from the evidence, and upon which the non-movant relies, are 'implausible.'").

Similar to *Matsushita*, Crenshaw has failed to demonstrate any plausible motive for the Board to fraudulently procure a government loan. She does not allege, and there is no evidence to suggest, that the Board embezzled money or put the loan to a personal use. Addressing this issue,

---

[31](...continued)
outcome of the vote. Moreover, despite her contention, Crenshaw does not present any actual evidence suggesting that Defendants *did not* fully disclose the pertinent facts to the Board's attorney. For example, a party in Crenshaw's position might depose members of the Board or the attorney himself to ascertain the extent of disclosure.

Crenshaw merely argues that demonstrating a direct personal benefit is not necessary to prove a violation of the False Claims Act. (Doc. No. 69 at 14 (citing *Scolnick v. United States*, 331 F.2d 598, 599 (1st Cir. 1964)).) Although correct, this principle of law does not bear on the issue of plausibility. In this case, Crenshaw theorizes that the loan was either spent to repair roofs that were already repaired or used to replenish reserve funds. Why the Board would risk both criminal and civil liability for such a purpose is a looming question that Crenshaw fails to answer.[32] Thus, the factual implausibility of Crenshaw's claim, as to which she carried the burden of proof, requires her to come forward with some sort of "persuasive evidence" to support her claim rather than creating "metaphysical doubt" concerning the Board's intentions. *Matsushita Elec. Indus. Co., Ltd.,* 475 U.S. at 497. Crenshaw cannot meet this standard by merely relying on a weak inference. As a result, the evidence in this case is "so one-sided" that Defendants "must prevail as a matter of law." *Hickson Corp.*, 357 F.3d at 1260.[33]

**B. Conversion**

Crenshaw claims that Defendants converted her condominium by imposing a lien on it and by mortgaging the community property as security for the SBA loan. (Doc. No. 82 at 13-14.) Without even reaching the issue of whether Crenshaw's arguments are factually accurate, her claims fail as a matter of law. As Crenshaw concedes, Florida law holds that "real property cannot be the

---

[32] Aside from potential liability under the False Claims Act, Section 14 of the Loan Agreement explains that "[a]ny person who knowingly makes a false statement or misrepresentation to the SBA" commits a felony punishable by up to five years in prison and "anyone who wrongfully misapplies the proceeds of a disaster Loan shall be civilly liable to the Administrator in an amount equal to one and half times the original principal amount of the Loan." (Doc. No. 67-2 at 6.)

[33] Because there is no evidence that Defendants knowingly presented a false claim to the federal government, the Court does not reach Defendants' alternative argument that Crenshaw has failed to show the existence of an injury in fact.

subject of conversion." *Am. Intern. Land Corp. v. Hanna*, 323 So. 2d 567, 569 (1975) (citing *Quitman Naval Stores Co. v. Conway*, 63 Fla. 253 (1912)). Crenshaw attempts to avoid this result by arguing that "an equitable owner of property may bring an action for conversion." (Doc. No. 82 at 13 (citing *Bove v. PBW Stock Exch., Inc.*, 382 So. 2d 450, 450 (Fla. 2d DCA 1980)).[34] However, the argument is unpersuasive. Even if Crenshaw's property interests were construed as "equitable," they would still be equitable interests in *real property*, which cannot be the subject of an action for conversion. Critically, Crenshaw has not offered any argument why an equitable interest in real property would be treated differently than a legal interest in real property for purposes of a conversion action. Thus, Defendants are entitled to summary judgment on Crenshaw's conversion claim.

**C. Intentional Infliction of Emotional Distress**

Crenshaw also sues for intentional infliction of emotional distress. Defendants move for summary judgment on this claim, citing two arguments in support: (1) Crenshaw has failed to link the incidents of harassment to any particular Defendant; and (2) the alleged incidents of harassment are not sufficiently "extreme and outrageous" to permit a claim of intentional infliction of emotional distress. (Doc. No. 67 at 13-15.) In response, Crenshaw argues that she was "subjected to relentless abuse, including property damage by Nancy Degayner and Kass Genneken." (Doc. No. 82 at 17.) She emphasizes that a handwriting expert matched the handwriting in several offensive letters to samples taken from Degayner and Genneken and that she saw a sign containing offensive language directed at her in Genneken's truck. (*Id.*) Finally, Crenshaw describes her own reaction

---

[34] *Bove* concerned the equitable interest of a stock trader in his seat at the stock exchange. *Bove*, 382 So. 2d at 452-53.

to the incidents and then gives two examples of harassment: (1) letters which referred to Crenshaw as a "low-down nasty Nigger," "whore," "slut," and "many other derogatory terms"; and (2) a sign left outside of Crenshaw's friend's condominium that describes one of Crenshaw's books as "targeted for the adult beastiality [sic] reader." (*Id.* at 17-20.)

The Court will analyze each of Defendants' arguments in turn.

**1. Incidents of Harassment Traceable to Defendants**

Defendants contend that "there is no evidence in the record that would indicate which individuals are responsible for the alleged harassment." (Doc. No. 67 at 13.) In support, they cite to several portions of Crenshaw's deposition where she stated that she could not identify the person who broke her window, that she did not know the origin of any of the typed letters she received, and that at least one envelope, containing a large color photo of the grim reaper, was sent to Crenshaw's friend from an anonymous source. (Doc. No. 68-2 at 12, 14; Doc. No. 68-4 at 4.) Crenshaw responds by arguing that she can link certain "letters" to Degayner and Genneken, and that she saw a sign in Genneken's truck that was directed at her. (Doc. No. 82 at 17.) Crenshaw does not argue that she can trace any of the other alleged incidents of harassment to any particular Defendant or that the Court should infer that these incidents of harassment can be attributed to any of the named

Defendants.[35] (*Id.*) Furthermore, Crenshaw does not attempt to link the pictures of the noose, urn, and grim reaper to any particular named Defendant.[36]

Although not cited in her Response to Defendants' Motion for Summary Judgment, Crenshaw's affidavit avers:

> On August 16, 2006, I received call from Gena at Tyler Property Management and informed that the front window of my condo [sic] broken for the second time. She stated that the renter suspects Kass Genneken was the perpetrator and stated he has made previous unsuccessful attempts to break the back window of the condo as well.

(Doc. No. 83-2, ¶ 50.) Defendants object to this statement as hearsay, and Crenshaw offers the following response:

> This statement is a statement of Plaintiff's personal knowledge of a conversation she had with Gena Plante at Tyler Property Management the company managing my condominium. This statement is relevant, the witness would likely be called as a witness in this case, and would be admissible under Fed. R. Evid. 803(1) and 803 (3), and is arguably not even hearsay as it goes to the direct effect on the listener, Crenshaw.

(Doc. No. 88 at 10 (punctuation as in original).) Crenshaw's arguments are unpersuasive, and there is no indication that this statement would be admissible at trial. Crenshaw does not explain whether

---

[35] Crenshaw states: "Additionally, Plaintiffs' Counsel has submitted a public records requests [sic] to the appropriate law enforcement agencies in [sic] for the purpose of gaining access to the original documents in order to have fingerprinting and/other testing done on those items." (*Id.*) Stating an intention to provide additional evidence, particularly two months before trial, does not satisfy a plaintiff's burden of demonstrating genuine issues of material fact. Had Crenshaw desired an extension of time to locate this evidence, the proper vehicle would have been a motion for extension of time to respond to Defendants' Motion for Summary Judgment or a motion to defer the Court's ruling on Defendants' Motion for Summary Judgment.

[36] Crenshaw's affidavit also fails to explain whether any of these pictures can be linked to a named Defendant, and the Court is unable to locate any other evidence in the record linking the pictures to the named Defendants. Although Crenshaw's expert traced various envelopes and handwritten letters to Genneken and Dagayner, Crenshaw describes these letters as "harassing and racially derogatory" and not as threatening. (Composite, Ex. 30; Doc. No. 82 at 17.)

the "witness" she "would likely . . . call" is Gena Plante or the tenant. Moreover, the statement has nothing to do with Crenshaw's "personal knowledge" because it describes a conversation with Crenshaw, not something Crenshaw personally experienced. *See, e.g.*, *Corwin v. Walt Disney Co.*, No. 6:02-cv-1377-Orl-19KRS, 2004 WL 5486639, at *18 (M.D. Fla. Nov. 12, 2004). Federal Rule of Evidence 803(1) is inapplicable because there is no foundation laid for a "present sense impression," and Crenshaw gives no indication that she would be able to lay such a foundation at trial.[37] *See* Fed. R. Evid. 803(1) (describing the exception as "[a] statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter"). Federal Rule of Evidence 803(3) is inapplicable because the evidence is not being introduced for purposes of establishing the tenant's or Gena Plante's "existing mental, emotional, or physical condition." Fed. R. Evid. 803(3). Finally, Crenshaw is not attempting to introduce the statement for purposes of establishing the "direct effect on the listener, Crenshaw."

Because Defendants have demonstrated an absence of genuine issues of material fact with regard to who was responsible for the various incidents of harassment, the burden shifts to Crenshaw to come forward with evidence establishing this link. *Celotex Corp.*, 477 U.S. at 322. She has traced some, but not all, of the incidents of harassment to particular defendants. Accordingly, the Court will only consider (1) letters and signs that Crenshaw's handwriting expert traced to Defendants Degayner and Genneken, and (2) the sign which Crenshaw saw in the back of Genneken's truck.

---

[37] The statement is an example of "double hearsay," and it is difficult to imagine how Crenshaw would lay a "present sense impression" foundation for two layers of hearsay. *See United States v. Medico*, 557 F.2d 309, 320 n.3 (2d. Cir. 1977) (Mansfield, J., dissenting).

**2. Whether the Harassment was "Extreme and Outrageous"**

Under Florida law, "the tort of intentional infliction of emotional distress requires that the conduct be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Baskin v. McGregor Baptist Church, Inc.*, No. 2:07-cv-710-FtM-29DNF, 2008 WL 1930622, at *1 (M.D. Fla. Apr. 30, 2008) (quoting *Metro. Life Ins. Co. v. McCarson*, 467 So.2d 277, 278-79 (Fla.1985)). The plaintiff's "subjective response to the conduct does not control"; rather, "the conduct must be evaluated on an objective basis." *Id.* (citing *McCarson*, 467 So. 2d at 278-79). Accordingly, "[w]hether the alleged conduct satisfies this high standard is a legal question 'for the court to decide as a matter of law.'" *Id.* (citing *Vance v. So. Bell Tel. & Tel. Co.*, 983 F.2d 1573, 1575 n.7 (11th Cir. 1993)).

The parties disagree over what constitutes "outrageous" and "extreme" conduct. Defendants cite *Vance*, 983 F.2d at 1575 n.7, and *Lay v. Roux Laboratories*, 379 So. 2d 451, 452 (Fla. 1st DCA 1980), for the proposition that "racially hostile conduct, although extremely reprehensible" does not rise to the degree of "outrageousness or atrociousness" sufficient to sustain a claim for intentional infliction of emotional distress. (Doc. No. 67 at 14.) Crenshaw responds by summarily dismissing these cases as "employment-related" without explaining why the distinction matters. (Doc. No. 82 at 17.)

Crenshaw relies on three cases in support of her arguments. First, Crenshaw cites *Middlebrooks v. Hillcrest Foods, Inc.*, 256 F.3d 1241 (11th Cir. 2001) and gives the following summation:

> In *Middlebrooks* [], the cook, Hal Hanley, who is white, was taking some food off the grill when he turned and said that the motherfuckers who weren't buying

> anything were going to have to get out and that he was not going to serve any niggers. The court ruled that Hanley called Middlebrooks and the band members "motherfuckers" and "niggers," although five of the plaintiffs did not hear the offensive language, they learned of it soon afterward, either while they were still in Waffle House or when they were in the parking lot. The plaintiffs characterized their feelings after the incident as humiliation, embarrassment, disbelief, shock, shame, and disgust. The court ruled that the jury's award of compensatory and punitive damages was not inconsistent with the evidence.

(Doc. No. 82 at 18.) Next, Crenshaw cites *Williams v. City of Daytona Beach*, No. 6:04-cv-1879-ORL-19, 2006 WL 354635 (M.D. Fla. Feb. 15, 2006), where this Court denied a motion for summary judgment on a plaintiff's intentional infliction of emotional distress claim against several police officers who "choked, kicked, and punched him after he had already been handcuffed, subdued, and arrested." *Williams*, 2006 WL 354635, at *24. Finally, Plaintiff cites *Nims v. Harrison*, 768 So. 2d 1198, 1201 (Fla. 1st DCA 2000), where Florida's First District Court of Appeals found that a teacher stated a claim for intentional infliction of emotional distress due to a student-published "newsletter" threatening to kill the teacher and rape her children. *Nims*, 768 So. 2d at 1201.

The Court's own research revealed a very limited set of cases in which courts recognized conduct as sufficiently egregious to support a claim of intentional infliction of emotional distress. For example, in *Vernon v. Med Management Associates of Margate, Inc.*, 912 F.Supp. 1549, 1561 (S.D. Fla. 1996), the trial court in the Southern District of Florida found that the employee's alleged action of repeatedly touching, squeezing, fondling, hugging, blowing, and tickling the plaintiff along with the repetition of lewd and vulgar sexual remarks precluded the dismissal of plaintiff's complaint at the motion to dismiss stage. Similarly, in *Stockett v. Tolin*, 791 F. Supp. 1536, 1556 (S.D. Fla. 1992), the trial court in the Southern District of Florida found that the plaintiff was entitled to compensatory damages for intentional infliction of emotional distress where the plaintiff

was pinned against the wall, refused to allow to escape, and physically attacked on a weekly basis. In *Johnson v. Thigpen*, 788 So.2d 410, 414 (Fla. 1st DCA 2001), Florida's First District Court of Appeal found that the defendant's use of sexually explicit, demeaning, and vulgar language coupled with evidence of inappropriate, unwelcomed physical contact was outrageous conduct under Florida law. *See also Urquiola v. Linen Supermarket, Inc.*, No. 94-14-CIV-ORL-19, 1995 WL 266582, at *4 (M.D. Fla. Mar. 23, 1995) (plaintiff's allegations stated a claim for intentional infliction of emotional distress where plaintiff alleged numerous incidents of kissing, groping, attempted rape, and use of sexually explicit, demeaning, and vulgar language); *Koutsouradis v. Delta Air Lines, Inc.*, 427 F.3d 1339, 1345 (11th Cir. 2005) (finding that insults and indignities do not support a claim for intentional infliction of emotional distress); *Baskin*, 2008 WL 1930622, at *2 (dismissing an action for intentional infliction of emotional distress against school for allegedly disciplining children without cause); *Vamper v. United Parcel Serv., Inc.*, 14 F. Supp. 2d 1301, 1306 (S.D. Fla. 1998) (explaining that the tort of intentional infliction of emotional distress is sparingly recognized by Florida courts and may proceed where there is relentless physical as well as verbal harassment); *Howry v. Nisus, Inc.*, 910 F.Supp. 576, 580-81 (M.D. Fla. 1995) (employer's action of physically touching himself and employees in a suggestive manner, using obscene language, and commenting on sex organs was insufficient under Florida law to state a claim for intentional infliction of emotional distress).

Under these principles, Crenshaw's action for intentional infliction of emotional distress fails as a matter of law because the conduct traceable to Degayner and Genneken is not sufficiently "extreme," "outrageous," or "atrocious." The above cited cases reveal that some level of physical contact or severely threatening behavior is typically required to state a claim for intentional infliction

of emotional distress. *See, e.g.*, *Vamper*, 14 F. Supp. 2d at 1306. Although there is evidence that Degayner and Genneken directed offensive and reprehensible language at Crenshaw, the case law is clear that such insults and indignities are not sufficient, alone, to maintain an action for intentional infliction of emotional distress. Similarly, Crenshaw's own mental distress is not relevant to the issue of whether the traceable conduct is sufficiently "extreme," "outrageous," or "atrocious." *Baskin*, 2008 WL 1930622, at *2.

Furthermore, the cases cited by Crenshaw are distinguishable. Crenshaw's summary of *Middlebrooks* ignores the court's preliminary statement that: "[b]ecause [the defendant] failed to argue that there was insufficient evidence to support a prima facie case of intentional infliction of emotional distress and that Georgia statutory law precludes an award of punitive damages in a case such as this, we will not address these claims." *Middlebrooks*, 256 F.3d at 1246. Thus, the merits of the intentional infliction of emotional distress claim were not before the court, and the court's discussion of the defendant's conduct only concerned whether its "conduct was adequately egregious to support an award of punitive damages." *Id.* Moreover, the case analyzed Georgia, not Florida, law.

Likewise, Crenshaw's reliance on *Williams* and *Nims* is misplaced. Both cases involved actual physical violence or threats of violence. *Williams*, 2006 WL 354635, at *24; *Nims*, 768 So. 2d at 1201. As explained above, Crenshaw has failed to produce evidence that any particular Defendant was responsible for the damage to her condominium or sent her pictures of the grim

reaper, nooses, or urns.[38] Thus, the incidents of harassment in this case are less severe than those before the courts in *Williams* and *Nims*.

Accordingly, Defendants are entitled to summary judgment on Crenshaw's claim of intentional infliction of emotional distress.

**D. Civil Conspiracy**

An action for civil conspiracy must be premised on an underlying tort or cause of action. *Liappas v. Augoustis*, 47 So. 2d 582, 582 (Fla. 1950); *Palmer v. Gotta Have It Golf Collectibles, Inc.*, 106 F. Supp. 2d 1289, 1302-03 (S.D. Fla. 2000) ("Florida law is well established that an actionable conspiracy requires an underlying actionable tort or wrong."). Crenshaw has failed to present sufficient evidence that Defendants are liable for an underlying tort or cause of action, and Defendants are therefore entitled to summary judgment on Crenshaw's civil conspiracy claim.

## III. Plaintiffs' Motion for Summary Judgment

The Court grants Defendants' Motion for Summary Judgment in whole and therefore denies Plaintiffs' Motion for Summary Judgment as moot.

---

[38] In any event, if the Court were to consider this evidence for purposes of determining whether Defendants' conduct was sufficient to state a claim for intentional infliction of emotional distress, the result would likely not change. Crenshaw was not the victim of actual physical violence, and the pictures of the grim reaper, noose, and urn, even if considered threats, were not as "extreme," "outrageous," or "atrocious" as the threats in *Nims*, where the defendants explicitly threatened to kill the plaintiff and rape her children. Furthermore, Crenshaw has not presented, and the Court has not located, any additional case law that would recognize the alleged conduct in this case as sufficient to state a claim for intentional infliction of emotional distress.

## Conclusion

The Motion for Final Summary Judgment and Memorandum of Law by Defendants (Doc. No. 67, filed Mar. 13, 2008) is **GRANTED**. All other pending motions are **DENIED** as moot. The Clerk shall enter judgment in favor of Defendants and close the case file.

**DONE** and **ORDERED** in Chambers in Orlando, Florida on June 13, 2008.

PATRICIA C. FAWSETT, CHIEF JUDGE
UNITED STATES DISTRICT COURT

Copies furnished to:

Counsel of Record